## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

ADAM McRUNNEL,

       Plaintiff,


v.
                      **MEMORANDUM OF LAW & ORDER**
                      Civil File No. 11-755 (MJD/LIB)


BATCO MANUFACTURING,

       Defendant.

---

Kim E. Brust and Mara C. Brust, Conmy Feste Ltd., Counsel for Plaintiff Adam McRunnel.

Caryn A. Boisen and Mark A. Solheim, Larson King LLP, Counsel for Defendant Batco Manufacturing.

---

## I.    INTRODUCTION

This matter is before the Court on Defendant Batco Manufacturing's Motion to Exclude Expert Testimony [Docket No. 47] and Motion for Summary Judgment [Docket No. 50]. The Court heard oral argument on December 14, 2012. For the reasons that follow, the Court denies both motions.

## II.    BACKGROUND

### A.    Factual Background

1

Plaintiff Adam McRunnel is a Minnesota resident. Defendant Batco

Manufacturing ("Batco") is a Canadian entity that does business in the United

States, including in the State of Minnesota. Batco manufactures belt conveyors

and other equipment that are used for handling crops, seeds, and commodities.

Norwood Sales, Inc. is a North Dakota corporation that distributes farm

equipment that is manufactured and designed by Batco.

Circle C Seeds, Inc. ("Circle C") is a Minnesota corporation with its

principal place of business in Minnesota. McRunnel was working for Circle C at

the time he sustained his injury at issue in this lawsuit.

### 1.   The Belt Conveyor System

The belt conveyor system involved in this case was manufactured by Batco

and sold by Batco's distributor, Norwood Sales, to Keith Chisholm Farms, Ltd.,

on August 27, 1999. Keith Chisholm Farms transferred ownership of the belt

conveyor to Circle C. Circle C used the conveyor in its soybean processing

activities.

Conveyors such as the one involved in this matter are used to transport

soybeans or other grains from a truck into a grain bin or other storage facility.

The conveyor system is powered by a power take off ("PTO") shaft. When a user

hooks the PTO shaft to a tractor, the tractor's motor powers the conveyor's S-drive, which causes the belt to run.

Beans are dumped into a hopper at the foot of the conveyor. The conveyor then transports them up a belt, discharging them into a bin or storage facility. The belt runs continuously, looping back toward the hopper area where it enters the inlet side of the S-drive. The belt circles back from the hopper to the discharge spout.

Defendant asserts that substantial alterations were made to the Batco conveyor after it was sold by Batco. (Stenson Aff. ¶ 8.) First, although Batco manufactured the conveyor with sealed bearings, which do not require greasing, located just inside the metal casing of the S-drive (Stenson Aff. ¶ 9; Stenson Dep. 57-58), the sealed bearings on the take-up roller on the side of the S-drive's metal casing were replaced with non-sealed bearings, not manufactured by Batco, that required periodic greasing (Stenson Aff. ¶ 9; Stenson Dep. 100). The replacement bearings were not standard Batco equipment and were of a type that had never been supplied by Batco. (Stenson Aff. ¶ 9; Stenson Dep. 108.)

Batco also contends that, after the Batco conveyor was manufactured and sold, the belt drive path was reconfigured. (Stenson Aff. ¶ 10; Stenson Aff., Ex.

3

C.)  Batco claims that, as it originally designed and manufactured the belt, it ran

from the top of the guiding return roller to the top of the 10 ½ roller.  (Id.)

However, by the time of the accident, the belt went from the top of the guiding

return roller to the bottom of the wrap roller.  (Stenson Aff. ¶ 10; Stenson Aff.,

Ex. C; Malguarnera Report at 3-4.)

### 2.   The Accident

On January 18, 2010, McRunnel sustained injuries to his arm while

working with the belt conveyor system manufactured by Batco.  While he was

using the belt conveyor system to transfer soybeans, he heard a squeaking,

squealing, or grinding sound.  (McRunnel Dep. 65, 99.)  McRunnel thought that

the machine's bearings needed to be greased, so he decided to grease the

bearings with a grease gun.  (Id. 99-104.)  This required him to kneel down and

reach under the conveyor in order to access the bearings.  (Id. 103–04.)  Plaintiff

left the machine on during the greasing because he understood through his work

as a mechanic that bearings are best lubricated when the machine is running.

(Id. 215.)  After McRunnel was done, he hung the grease gun on a long bolt on

the machine.  (Id. 111.)  Then he "scooted" back on his hands and knees.  (Id.

113.)  Once he thought he was a safe distance from the belt, where he had

4

originally squatted down, he stood and started to turn away from the conveyor, with the right side of his body closest to the conveyor.  (Id. 114-15.)

McRunnel contends that when he thought was a "safe distance," he turned and "felt like somebody grabbed [his] arm and shoved it in the belt."  (McRunnel Dep. 104; see also id. 115-16.)  The conveyor belt continued to move while his arm was caught in the machine.  (Id. 118.)  His arm was eventually freed from the machine when another person broke the bar that was trapping his arm.  (Id. 120–21.)

McRunnel's hand and arm were seriously injured, and he has undergone numerous surgeries.  (See McRunnel Dep. 130.)

### 3.    The Warning Labels

A warning label, located on the conveyor, on both sides of the S-drive unit, stated:

**! WARNING**
**ROTATING PART HAZARD**
**KEEP AWAY**

To prevent serious injury or death from rotating parts:

1. Place all controls in neutral or off, stop engine or motor, remove ignition key or disable power source and wait for all moving parts to stop before servicing, adjusting, repairing or unplugging.

2. Install and secure all guards before operating.

3. Do not operate with rotating parts exposed.

(Stenson Aff., Ex. B at BATCO 124, 142 (also showing a picture of a hand caught in the belt and a picture of an arm caught in the belt).)

A warning label on top of the tube of the conveyor stated:

**! CAUTION**

1. Read and understand the Operator's Manual before operating.

2. Keep all safety shields and devices in place and in good working order.

3. Make certain everyone is clear before operating or moving the machine.  Keep children, visitors and untrained people away.

4. Keep hands, feet, hair and clothing away from moving parts.

* * *

(Id. at BATCO 137, 198.)

The Batco operator's manual also included multiple admonitions to turn off the conveyor before performing any maintenance.  (Operator's Manual at 3, 4, 8, 44.)  It also contained the same warnings that were posted on the conveyor

itself.  (<u>Id.</u> at 15-16.)  The operator's manual warned users to stay out of the area near the inlet side of the S-drive.  (<u>Id.</u> 5, 30.)

### 4.    Plaintiff's Expert

Plaintiff offers the opinion of mechanical engineer Gary Huitink.  Huitink notes that the conveyor at issue has an unguarded opening to the S-drive approximately 23 inches wide and 11 inches high, with a 1.5-inch gap above the small guide roller.  (Huitink Report at 10.)  Huitink opines that the gap constitutes an exposed "nip point," which, under industry standards, must be guarded.  (<u>Id.</u> at 10-12.)  Huitink concludes that Batco was negligent in failing to guard the exposed nip point.  He opines that, because there was no guard, the conveyor belt snagged McRunnel's right coat sleeve and jerked his arm into the exposed nip point.

### B.    Procedural History

In March 2011, McRunnel commenced an action against Batco and Norwood Sales in Minnesota state court.  Batco removed the action to this Court, based on diversity jurisdiction.  The Complaint alleges three counts against both Batco and Norwood Sales—Count One: Strict Liability, Count Two: Negligence, and Count Three: Breach of Warranty.

On October 3, 2011, Batco filed a Third-Party Complaint against Plaintiff's employer, Circle C for a claim for contribution and indemnity.  [Docket No. 23] Based on the parties' stipulation, this Court dismissed Circle C from this lawsuit on July 10, 2012.  [Docket No. 46]  Based on another stipulation by the parties, on May 29, 2012, this Court dismissed Norwood Sales from the lawsuit.  [Docket No. 44]  At this juncture, the only remaining parties are Plaintiff McRunnel and Defendant Batco.

Batco now moves to exclude the testimony of McRunnel's expert and for summary judgment.

## III.  DAUBERT MOTION

### A.  Daubert Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  The proponent of the testimony has the burden to show by a preponderance of the evidence that the testimony is admissible under Rule 702. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Under the framework developed in <u>Daubert</u>, trial courts must serve as gatekeepers to insure that proffered expert testimony is both relevant and reliable.  Trial courts are given broad discretion in fulfilling this gatekeeping role . . . ."  <u>Wagner v. Hesston Corp.</u>, 450 F.3d 756, 758 (8th Cir. 2006) (citations omitted).  The proposed testimony must be useful to the factfinder; the expert witness must be qualified; and the proposed evidence must be reliable.  <u>Lauzon</u>, 270 F.3d at 686.  "[D]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility."  <u>Miles v. Gen. Motors Corp.</u>, 262 F.3d 720, 724 (8th Cir. 2001) (citation omitted).

In determining the reliability and relevance of the proffered testimony, the Court examines factors such as

whether the theory or technique is subject to testing, whether it has been tested, whether it has been subjected to peer review and publication, whether there is a high known or potential rate of error

9

associated with it, and whether it is generally accepted within the
relevant community.

Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005) (citation omitted).

However, "[t]his evidentiary inquiry is meant to be flexible and fact specific, and

a court should use, adapt, or reject Daubert factors as the particular case

demands.  There is no single requirement for admissibility as long as the proffer

indicates that the expert evidence is reliable and relevant."  Id. (citation omitted).

## B.    Whether Huitink Is Qualified

Although Defendant raises a number of objections to Huitink's

qualifications, the Court concludes that those objections go to the weight of his

testimony, not its admissibility, and can be adequately addressed on cross

examination.

### 1.    Lack of Minnesota Engineering License

Batco argues that Huitink is not qualified because, although he is licensed

as a professional engineer in Arkansas, he is not licensed in Minnesota, yet has

engaged and intends to engage in the practice of professional engineering

services in Minnesota.  See Minn. Stat. § 326.02.  The Court holds that licensing in

the jurisdiction of the lawsuit is not a prerequisite for admissibility under Rule

702.  The pertinent question is whether Huitink is qualified under Rule 702.  See,

e.g., <u>Dillon Cos., Inc. v. Hussmann Corp.</u>, 163 Fed. App'x 749, 756 (10th Cir. 2006)

(holding that there is no authority that an expert witness who is a consulting

engineer needs to be licensed in the state in which the lawsuit is venued and

holding engineer to be qualified when he "was licensed in numerous other

states"); <u>Principi v. Survivair, Inc.</u>, No. 6:04-cv-476-Orl-JGG, 2005 WL 5961991, at

*2 (M.D. Fla. Oct. 18, 2005) (holding that whether expert witness engineer was

licensed in state of lawsuit "has no bearing on the admissibility of his testimony;

[r]ather, the appropriate inquiry on qualifications is whether [the expert] is 'an

expert by knowledge, skill, experience, training, or education') (quoting Fed. R.

Evid. 702).

### 2.    Biomechanical Engineering and Human Factor Expertise

Batco further argues that, although Huitink is a licensed engineer, he is not

qualified to testify regarding every type of engineering issue, since, for example,

he is not a biomechanical engineer and has never designed a grain conveyor or

worked on the development of warnings for a grain conveyor.  Huitink is highly

qualified.  His engineering experience and education has been focused on safety

in the context of agricultural equipment.  "Gaps in an expert witness's

qualifications or knowledge generally go to the weight of the witness's

testimony, not its admissibility." <u>Robinson v. GEICO Gen. Ins. Co.</u>, 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted).  Huitink's training and experience as an agricultural engineer provides the foundation for him to express his opinion regarding how McRunnel's arm was pulled into the conveyor.  <u>See, e.g.</u>, <u>Fox v. Dannenberg</u>, 906 F.2d 1253, 1256 (8th Cir. 1990) ("[A]n individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise.").  Huitink has adequate experience and engineering education to give an opinion on the causation of McRunnel's injury.  Moreover, although Huitink does not label himself a "human factors consultant" (Huitink Dep. 12), Huitink has an engineering education, has experience using and seeing conveyors, has experience writing operator's manuals, and has seen people getting caught in accidents (<u>id.</u> 51).  This is sufficient to permit admission of his opinion regarding Batco's warnings.  Overall, any gaps in Huitink's qualifications can be addressed on cross examination.

## C.    Relevance and Reliability of Huitink's Testimony

The Court will not exclude Huitink's testimony simply because he has never tested his alternative design or subjected his design to peer review.

Batco argues that it is appropriate to exclude expert testimony regarding proposed design changes that have never been developed, tested, or subjected to peer review.  In this case, Huitink avers that other manufacturers have equipped similar belt conveyors with guarding like Huitink's proposed alternative design and Batco itself has produced conveyors with similar guarding.  (Huitink Report at 11; Huitink Dep. 67.)  Also, Batco witness Sherman Stenson testified that the proposed guarding would be technologically feasible but Batco made a conscious decision not to guard the S-drive inlet area.  (Stenson Dep. 39 (noting that other manufacturers do box their S-drive inlet area or use a wind guard), 81-82 (testifying that it was technologically feasible for Batco to make a weather guard for the conveyor that was involved in the accident).)  The testing of an alternative design is intended to determine the feasibility of the proposed alternative design, so testing is not required for admissibility if the modification has already been successfully used in the market.  See Young v. Pollock Eng'g Group, Inc., 428 F.3d 786, 790 (8th Cir. 2005).  Given that there is some evidence to support feasibility, any vagueness and lack of testing for Huitink's particular recommended modification can be addressed on cross examination.

The Court further concludes that the absence of peer review and publication is not dispositive because this is only one prong of the <u>Daubert</u> reliability test.  <u>See</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 151 (1999). The lack of peer review is less critical here when the proposed alterative design exists in the marketplace and Huitink based his opinion on published engineering standards.

Similarly, given the existence of similar designs in the market and Huitink's use of established engineering standards, the fact that Huitink admits that he created his proposed alternative design solely for the purposes of this litigation (Huitink Dep. 70) is a fact that goes to the weight to be given his testimony, but does not warrant exclusion.

### D.    Whether Huitink's Opinions Are Supported by the Record

If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate.  Even a theory that might meet certain <u>Daubert</u> factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case.

<u>Concord Boat Corp. v. Brunswick Corp.</u>, 207 F.3d 1039, 1056 (8th Cir. 2000) (citations and footnote omitted).  However,

[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the

opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (citation omitted).

Here, Batco argues that Huitink's opinions are so fundamentally unsupported by the record that they should be excluded based on his failure to account for the replacement of the bearings, the reconfiguration of the belt path, and outside consulting advice received by Batco.  The Court concludes that all three issues can be adequately addressed on cross examination.

### 1. Consideration of Alterations to the Conveyor

### a) Bearings

The parties agree that the original bearings were sealed and did not require greasing but, at some point, were replaced with bearings that do require greasing.  They also agree that the reason McRunnel was in the position that he was in when he was injured was because he had been greasing those bearings.  However, it is a question for the jury whether Batco should have reasonably expected that its sealed bearings would be replaced by bearings that required greasing or that, even without bearings that required greasing, for other reasons, users would be in that area during operation of the machine.  As McRunnel

points out, Batco's warnings and operator's manual did not inform the end user

that it must use sealed bearings when it replaced worn bearings.  (See

Malguarnera Dep. 62; Operator's Manual.)  Also, instructions regarding greasing

in the operator's manual could be interpreted to indicate that Batco anticipated

and approved of the replacement of the sealed bearings with bearings that

required greasing.  (Operator's Manual at 35.  But see id. ("NOTE: Most original

equipment bearings used by Batco are sealed units and will not accept grease.").)

### b)      Belt Drive Path

Batco argues that, at some point, the belt drive path on the conveyor was

reconfigured.  Defendant's expert opines that the reconfiguration of the belt

drive path caused the belt to be in direct contact with the roller, causing contact

force between the roller and belt that would not otherwise have existed and

causing McRunnel's ulnar fracture.  (Morr Report at 4; see also Malguarnera

Report at 3-4; Morr Report at 5.)  Huitink admitted that he did not perform any

testing to determine if the tension differed between the belt path as allegedly

manufactured by Batco and as it existed at the time of the accident.  (Huitink

Dep. 27-28.)

The Court will not exclude Huitink's testimony based on the belt configuration issue because there is a factual dispute regarding whether the belt was reconfigured and moreover, the experts disagree on whether any reconfiguration materially affected McRunnel's injury.  As McRunnel points out, there is no contemporary documentation created by Batco supporting the assertion that the conveyor was sold with a particular belt path configuration.  Also, both parties' experts agree that, if a user followed the instruction manual and replaced the old belt by attaching the new belt to the end of it, then the new belt would be in the same configuration as the old belt.  Based on this fact, McRunnel asserts that it is highly unlikely that the new belt path was different than the original belt path.  There is also a question of fact regarding whether the alleged belt modification could have caused his injury.  Huitink testified that the routing of the S-drive does not create an end running nip point.  (Huitink Dep. 30.)  In his opinion, the nip point existed whether the belt was routed either way and there would be no measurable difference in tension between the two configurations.  (Id. 28, 30-31.)

## 2.    Consideration of Batco's Safety Analysis

In 1996, Batco consulted with engineer Warren Lenius from Lenius

Product Safety Consulting.  (Lenius Aff. ¶ 2; Stenson Aff. ¶ 4; Stenson Dep. 35-

36.)  Lenius performed a safety audit of Batco's grain conveyors and created

operator's manuals and warning labels for the conveyors.  (Id.)  Lenius

recommended that Batco not place a guard over the inlet side of the S-drive

because the area was guarded by location.  (Stenson Aff. ¶ 4; Stenson Dep. 37.)

Also, Lenius opined that adding a guard in that location would create a pinch

point and would make it more difficult to operate the conveyor because it would

be difficult to see inside the S-drive without crawling underneath the conveyor

area where the PTO shaft connected the conveyor with the tractor.  (Stenson Aff.

¶ 4; Stenson Dep. 37-38.)

Batco argues that Huitink's testimony is unfounded because he did not

review any of the documentation from Lenius before creating his report in this

case; nor did he revise his opinions after issuing his initial report.  (Huitink Dep.

72-73.)  After Huitink issued his report, he did review the documents from

Lenius and opined that they did not alter his opinion.  (Huitink Aff. ¶ 12.)  Batco

also points out that Huitink opined that Batco failed to make appropriate safety

considerations when it designed and manufactured the conveyor involved in

18

McRunnel's accident.  (<u>See, e.g.</u>, Huitink Report at 17.)  Batco concludes that

Huitink's opinion is flawed because he failed to consider that Batco did consult

with a well-qualified safety consultant and follow his advice in designing and

manufacturing the conveyor at issue.

The Court concludes that the import and adequacy of Lenius's advice to

Batco are issues best addressed on cross examination.

## IV.    SUMMARY JUDGMENT MOTION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of

Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### B.    Strict Liability

Under Minnesota products liability law, "[i]n order to recover under the theory of strict liability, the plaintiff must establish (1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control, and (3) that the defect was the proximate cause of the injury sustained." Bilotta v. Kelley Co., 346 N.W.2d 616, 623 n.3 (Minn. 1984) (citation omitted).  Breach of the implied warranty of merchantability can merge into strict liability and is analyzed under the same factors.  See, e.g., In re Shigellosis Litig., 647 N.W.2d 1, 11 (Minn. Ct. App. 2002).

### 1.      Defective Design and Defective Manufacture

First, because the Court has denied Batco's Daubert motion, McRunnel has sufficient evidence and expert testimony to survive summary judgment on his theory that the conveyor was defective when it left Batco's control on the grounds that it lacked an adequate guard rendering the conveyor defective and unreasonably dangerous.

### 2.      Causation

#### a)      Substantial Change to Product

The Court denies Batco's request for summary judgment based on the allegation of substantial changes to the conveyor.  Batco argues that "a plaintiff claiming strict liability must show not only a defect causing injury, but also that the product[] is expected to and does reach the user or consumer without substantial change in the condition in which it was sold."  Rients v. Int'l Harvester Co., 346 N.W.2d 359, 362 (Minn. Ct. App. 1984) (citation omitted).  However, Minnesota only prevents recovery when a plaintiff cannot prove that the alleged defect and not the alleged modifications were the cause of the injury, not simply whenever there is any modification to the product.  See Moe v. MTD Prods., Inc., 73 F.3d 179, 184 (8th Cir. 1995).

Batco claims that the bearings on the conveyor were changed from the original sealed bearings, which require no greasing, to replacement bearings that did require greasing and that the belt drive path was reconfigured.  Defendant argues that without these two substantial alterations, Plaintiff's injury would not have occurred.  Had the bearings been left in their original state, he never would have had to reach under the machine to grease the bearings.  Had the belt path not been altered, Plaintiff's arm may not have been caught between the roller and the belt.

As the Court explained with regard to the <u>Daubert</u> motion, there are genuine issues of material fact that preclude summary judgment on these issues. It is a question for the jury whether Batco should have reasonably expected that its sealed bearings would be replaced by bearings that required greasing or that, even without bearings that required greasing, for other reasons, users would be in that area during operation of the machine.  With respect to the alleged modification to the path of the belt drive, there are questions of material fact regarding whether the belt path was modified at all and, if so, if that modification caused McRunnel's injury.

### b)   Plaintiff's Use of the Product

Batco further argues that a plaintiff asserting strict liability must show that the injury was not caused by mishandling of the product.  <u>Moe</u>, 73 F.3d at 183; <u>see also</u> <u>Magnuson v. Rupp Mfg., Inc.</u>, 171 N.W.2d 201, 209 (Minn. 1969) ("[W]here the [dangerous] condition is obvious, [the plaintiff] must show that he made proper use of the product.").

Batco contends that McRunnel violated important safety warnings on the conveyor, which would constitute abnormal use of the product and thus bar recovery.  It notes that McRunnel testified that he had an understanding of

warning labels, generally, and the risk posed by moving parts.  (McRunnel Dep. 132–43).  McRunnel further admitted that he knew he should not get too close to a moving belt.  (Id. 109-10.)  Batco concludes that if he had followed the instruction to turn off the machine prior to servicing, his accident would never have occurred.

McRunnel retorts that, at the time of his injury, he was engaging in activity that workers routinely engage in.  McRunnel concludes that although Batco may not have intended workers to work around the conveyor belt as it was moving, it was reasonably foreseeable that workers would work in the general area in which he was injured.  As such, Batco had a duty to protect workers operating around that area, even if warning labels told them not to do so.  See, e.g., Bilotta v. Kelley Co., Inc., 346 N.W.2d 616, 621 (Minn. 1984) ("[A] manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.") (citation omitted).  Here, there is a genuine issue of material fact regarding whether Batco should have reasonably foreseen McRunnel's particular use of the conveyor.

### C.      Failure to Warn

A plaintiff asserting a negligent failure-to-warn claim under
Minnesota law must show: (1) the defendant[ ] had reason to know
of the dangers of using the product; (2) the warnings fell short of
those reasonably required, breaching the duty of care; and (3) the
lack of an adequate warning caused the plaintiff's injuries.

In re Levaquin Prods. Liab. Litig., 700 F.3d 1161, 1166 (8th Cir. 2012) (citations

omitted).  There are two obligations under the duty to warn: "(1) [t]he duty to

give adequate instructions for safe use; and (2) the duty to warn of dangers

inherent in improper usage."  Glorvigen v. Cirrus Design Corp., 816 N.W.2d 572,

582 (Minn. 2012).  "To be legally adequate, [a] warning should (1) attract the

attention of those that the product could harm; (2) explain the mechanism and

mode of injury; and (3) provide instructions on ways to safely use the product to

avoid injury."  Id. (citation omitted).

When a danger is "obvious to anyone using the product," then there is no

duty to warn about that danger.  Mix v. MTD Prods., Inc., 393 N.W.2d 18, 19

(Minn. Ct. App. 1986).   If a plaintiff was already fully aware of the specific

danger posed by the product, then the failure-to-warn claim will fail for lack of

causation.  Balder v. Haley, 399 N.W.2d 77, 81-82 (Minn. 1987).

Batco points out that McRunnel testified that he was aware of the risk of

injury or death associated with machines such as conveyor belt systems,

24

particularly when the machine is operating, and that he should keep his hands and feet away from moving parts.  (See, e.g., McRunnel Dep. 79-80, 137, 140.)  He also understood that a warning label generally means that one must be aware of a safety concern.  (Id. 132-33, 136-37.)  He admitted in his deposition that the information provided in the Batco warning labels are matters of plain common sense when working around machinery.  (Id. 142.)  Batco concludes that, because McRunnel admitted that he was aware of the danger posed by the conveyor, he cannot now claim that the warnings were inadequate.

The Court denies Batco's motion for summary judgment on the failure to warn claim.  Simply because a user is generally aware that moving parts pose a danger does not necessarily mean that a reasonable person would be aware of a risk of accidental entanglement when positioned in the particular location where McRunnel claimed to have been.  Also, to be legally adequate, a warning should not only highlight the danger, but should also "explain the mechanism and mode of injury" and "provide instructions on ways to safely use the product to avoid injury."  Glorvigen, 816 N.W.2d at 582 (citation omitted).  Plaintiff has also provided expert testimony regarding the alleged inadequacy of the location of the warnings.  (See Huitink Dep. 50-51.)

25

### D.     Primary Assumption of the Risk

The Court denies Batco's request to apply primary assumption of the risk to bar McRunnel's recovery on all claims.  Primary assumption of the risk relieves a defendant of its duty of care, providing an absolute bar to a plaintiff's recovery.  Armstrong v. Mailand, 284 N.W.2d 343, 348–49, 352 (Minn. 1979).  A finding of primary assumption of the risk requires (1) the plaintiff's knowledge of the risk; (2) his appreciation of the risk; and (3) a voluntary choice to take the risk despite the opportunity to avoid the risk.  Andren v. White-Rodgers Co., 465 N.W.2d 102, 104–05 (Minn. Ct. App. 1991).  "Whether a party has primarily assumed the risk is usually a question for the jury, unless the evidence is conclusive."  Schneider v. Erickson, 654 N.W.2d 144, 148 (Minn. Ct. App. 2002).

Batco argues that, here, McRunnel was aware of the risk posed by the conveyer belt's moving parts.  He knew that he needed to stay away from the moving parts to avoid entanglement and serious injury.  He also admitted that he violated the conveyor's warning labels by failing to turn off the machine before servicing it, and that, if he had followed the instructions, his accident would not have occurred.  Despite this knowledge, McRunnel did not turn off the machine before performing maintenance on it.

"Application of the primary assumption of risk doctrine is uncommon."

Rusciano v. State Farm Mut. Auto. Ins. Co., 445 N.W.2d 271, 273 (Minn. Ct. App.

1989) (citation omitted).  What is more, primary assumption of the risk does not

apply when a defendant's conduct enlarges the inherent risk posed.  See id.  At

this stage, there are unresolved questions regarding whether Batco increased the

risk by not making the machinery safe for its foreseeable use.  McRunnel points

to evidence from Huitink and the design of other conveyors to support of his

claim that the machine could have been made safer by simply adding a guard in

the area where he was injured.  McRunnel also asserts that he did not have actual

knowledge of the risk the machine posed.  Rather, he believed that he was not at

risk at the time of his accident because he thought he was a safe distance away

from the conveyor.  Because the parties dispute precisely how McRunnel's

accident occurred, it is not possible to assess the full extent of the risk of which

he had knowledge and appreciation.  It is premature to determine application of

primary assumption of the risk.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1.      Defendant Batco Manufacturing's Motion to Exclude Expert
         Testimony [Docket No. 47] is **DENIED**.

2.      Defendant Batco Manufacturing's Motion for Summary
        Judgment [Docket No. 50] is **DENIED**.

Dated:   January 10, 2013              s/ Michael J. Davis
                                       Michael J. Davis
                                       Chief Judge
                                       United States District Court